The court will proceed to the fourth case, United States v. Williams. Ms. Armour. Good morning. May it please the court. I'm Molly Armour, and along with Lillian McCartan, we represent Charlise Williams. There are two significant issues before the court raised by trial and sentencing in this case. The first deals with the Sixth Amendment and whether the district court here committed reversible constitutional error in circumscribing cross-examination on key areas of bias and motive, and also in barring the defendant from responding to certain lines of questioning by the government. Additionally, we have an issue, a significant issue, with regard to the computation of the guidelines, and this is whether the district court erred at sentencing in determining both the loss amount and the number of victims without evidence of causation that this loss resulted from any kind of criminal action or evidence of pecuniary harm. I'd like to begin with the loss amount issue, if I may, and the number of victims, because the analysis are interrelated here due to the insufficiencies of evidence presented by the government in both regards. The government essentially seeks a rule here that in a bankruptcy fraud case, all increase in debt is loss amount, and the government in the support looks to this court... I don't see why it has to be that broad. What you have here is a fairly unusual pattern of years of fraudulent filings to hold off the condominium association while the defendant keeps digging herself deeper and deeper into debt. Why isn't this a somewhat narrower rule? So I'd like to look at the kinds of debt that one could go into to try and examine how we could hold the entirety of a debt lawfully attributable to her. Take, for example, medical debt. There is a difference between buying a speedboat or spending in an extraordinary manner and going into debt for necessary reasons or for reasons related to poverty. In the government's Exhibit 901 at trial, it was a schedule of unsecured non-priority claims here. And in these claims, this debt that the government seeks to sweep into this loss amount includes debt from Mercy Hospital, which was medical service in 2009, from Hyde Park Hospital, which was medical service obtained in 2009, an advanced imaging center, Lab 1, Quest Diagnostics, which date was unknown, dental profile, and even Fox Lake Animal Hospital, presumably for a pet of Ms. Williams. This kind of debt does not rise to the kind of debt that we look at as being assessed to a defendant. That argument might make some sense in a garden variety bankruptcy fraud case, but that's not what this is. This is a Chapter 13 bankruptcy fraud case involving repetitive strategic manipulation of Chapter 13 to take advantage of the automatic stay and also fraudulent transfers of the home and so on. You know the facts better than I do. So it struck me as very sensible for the district judge to calculate loss amount in the way that she did here because of the course of conduct involved. It was very clear from the proofs that your client was strategically using these Chapter 13 bankruptcy filings over and over again to forestall the creditors in a fraudulent way with no intention of complying with the payment plan, so just continuing to let the debt accumulate. So it struck me as very sensible in this situation, not at all unfair, which is the essence of your argument, that it's not fair for this loss amount to include medical bills, etc. And that really was the thrust of the government's theory at trial, which was that this stay was being utilized for the purpose of staying in her home. Right, and that was substantiated, and she's found guilty, and the district court used that sensible theory to calculate the loss amount. I think under this court's precedent, we cannot sweep lawfully acquired debt into loss amount simply because a stay was utilized. We don't have here any causation, which Whiting requires. The question is not whether the debt was lawfully incurred. The question is whether she fraudulently used the bankruptcy code, and she's been found guilty of that, and the fraudulent use of the bankruptcy code caused this actually very conservative measure of loss to the creditors because that's what she intended, and likely much more. So this was, in my judgment, a very conservative estimate of the loss amount. Well, discussing we still must, debt still must be acquired with a measure of criminality under both 2B1.1 and this court's precedent. So regardless of whether she, assuming the government is correct in taking your Honor's question at that value, assuming that she fraudulently abused the stay, that does not mean that she did not have lawful debt. This is actually a rule that would take all the debt that she had acquired for reasons that were of personal need, of personal health use, and to call that acquisition of debt fraudulent because we do have to, Your Honor, look at how debt was acquired and when it was acquired. It has to result from a criminal action, and I don't think there's any allegation here that Ms. Williams sought medical attention for a criminal purpose, and we have some other cases in the circuit that talk about when someone doesn't have any ability to pay back debt. There is no loss amount considered at all. We've seen that in other contexts, and I might backtrack it even a little bit more and think about the underlying reason why we go through loss calculation. It is to assure that what is allowable is in and what is not allowable is kept out, and there are rules that say that certain debt cannot be counted towards the balance, and the utilization of the bankruptcy process does not somehow render previously gathered debt into unlawful debt. And I think, and we addressed this. Right, but what we have here, if I recall the numbers, the first filing assets and liabilities were about even, right? Approximately. Within a few thousand dollars, and then over the course of six, seven years, that gap grows by several hundred thousand dollars, right? That is correct, and she did also, during this period of time, make some payments towards this debt, a significant amount in the first bankruptcy before failing to make payments, $20,000 approximately and onward, and we do see a story told through these filings of someone who is struggling to get on top of their debt, but she doesn't file a different kind of chapter bankruptcy. She doesn't try to completely discharge this debt. She's attempting to manage this, and we don't have any evidence that at all, in the record, anywhere, that any of these other creditors sought, you know, had an actual loss. We have testimony, and this dovetails with our secondary issue, with the bias issues with Witnesses David Sugar and Carolyn Patterson. We have testimony from certain creditors. One creditor, the South Commons Condominiums Association. That's what we have in the record. That's the evidence that we have, and they certainly testified as to loss, and I think there is a very strong argument that that is appropriate measure of loss. In fact, that's what we argued at sentencing below because evidence had been established. This is a really low threshold for the government to meet, and yet there is a lack of evidence that there is actual loss here, and while we only need a reasonable calculation, we do in fact need a calculation that is based on facts and based on an assessment of what actually transpired, and we do think it was clear error for the court here to find this loss and that this court should remand for resentencing because it is a procedural error which clearly affected the guideline range here. I'd like to turn to the bias and motive issues and Ms. Williams' right to confrontation, which was significantly abridged by the court's rulings here. We disagree with the government. We believe that bias and motive evidence goes to the very core of the Sixth Amendment, and thus de novo review should apply here. The government cannot show that this is harmless beyond a reasonable doubt. The kind of decisions the district judge was making here about the extent of permitted cross-examination is about as discretionary as trial management comes. How does it become de novo review? It becomes de novo review because areas of testimony as to the bias of certain witnesses was circumscribed. Yes, but it's a question of how much, and what I didn't see in your brief was real engagement with Judge Kendall's rationale for allowing some of the cross-examination and limiting others. Well, there was complete limitations of certain cross-examination where the government was permitted to ask a witness whether or not they had any issue with Ms. Williams and treated her, let me back that up, whether they treated her any differently than anyone else. The court completely barred any inquiry from the defense as to whether in fact that was true. So what we have is, in that regard, we have an unanswered question. And we have a district judge's explanation of that, seeing that as she understood the line of questioning, it was designed to invite jury nullification of the validity of the underlying debt, likely to confuse the jury, stray from the actual issues the jury needed to decide. That sounds to me like an area where a district judge gets a fair amount of leeway. And I understand that, Your Honor, but nevertheless, bias and motive evidence is always relevant for a jury to examine how a person would engage in front of the jury as to these questions. These witnesses were presented to the jury as squeaky clean, as they had no issue and no potential bias. That is what was fronted by the government. By being unable to answer that in any way, her Sixth Amendment rights were circumscribed. And this becomes another example of how the government, in this case, was allowed to put in certain evidence and the defense was not allowed to answer it, which truly inverts the power dynamics at play. If I may reserve that balance for rebuttal. You may. Thank you. Thank you, Ms. Zellmer. Mr. Heinze? Good morning, Judge Flom, Judge Sykes, and Judge Hamilton. May it please the Court. Between January of 2003 and June of 2010, Charlize Williams blatantly and repeatedly abused the federal bankruptcy system, filing a series of five bad faith Chapter 13 cases and also inducing another person, Eckhard Wilkie, to file a sixth one, essentially acting as her straw man after the bankruptcy court had barred her from filing another case for 180 days. The numerous fraudulent acts that Charlize Williams committed during this period of time, as well as her failure at all to essentially pay any of these bankruptcy court approved repayment plans, demonstrates that she never intended to use the bankruptcy system to get her financial life in order, but rather she was hiding behind the automatic stay of bankruptcy laws to prevent her creditors, each and every one of them, from taking any action to collect the money that was owed to them. And that, in fact, not only prevented them from collecting on the older debts, but as the years went on it allowed her to incur even more debts as the year passed. Addressing first the issue with respect to the amount of loss and the number of victims calculation, as you've seen from the briefs from both sides, there's no real case law directly on point for this precise set of circumstances in which a defendant has filed a series of bad faith Chapter 13 cases in which she has no intention of repaying her creditors, but by filing all these cases she prevents her creditors from collecting the debts that they are owed. In the defendant's reply brief, there's a statement to the effect that this is not a case in which the debtor has concealed assets from the creditors, in which the debtor has functionally shrunk the pot of money from which the creditors could collect funds. But essentially that is quite similar to this case here. By filing all these bankruptcy cases, by being in a virtual perpetual state of bankruptcy, the defendant effectively denied access to her creditors to the entire pot of money that was comprised of her assets. Well, she's also doing fraudulent transfers of the home. Absolutely. A form of concealment. Yes. So there is actually some concealment in there, although that is included as an asset when she lists her assets and liabilities. But as your honors have noted, by causing all of her assets to be beyond the reach of her creditors, which is increasing in number over the years, that is the crime. And it doesn't really matter whether or not some of the expenses were incurred for what we'd call a legitimate medical expense or whatever. The crime is preventing all of her creditors from being able to collect on any of the debt. And her intent in this case to harm all of her creditors is shown by a number of factors, some of which Judge Hamilton referred to, for example. The continuous increase in the value of her liabilities, as reported by the defendant herself in the multiple bankruptcy cases that she filed year after year, along with the continuous decrease in her assets. Another factor that shows her intent to harm all of her creditors is her actual failure to pay virtually any of her creditors while she was in these many Chapter 13 cases, having to make payments to all of her creditors under court-approved plans. Could you address more directly, though, for example, the medical debt? Sure. Again, that may have been legitimately incurred. Let's assume that it was. I'll assume that, even on behalf of the dog or whatever pet Ms. Williams had. That's really not what's at issue here. What's at issue is that these medical expenses, as well as all of her other expenses, all the debts that she owes are unable to be collected by her creditors because she has filed a bankruptcy petition yet again. Your Honor, if you were to look at the different bankruptcy final reports of the trustees, you'll see the numbers spelled out real clearly. These are part of the additional exhibits that the government filed a motion to supplement the record on appeal. For the first four bankruptcy cases that she filed, there was a plan approved by the court, and the bankruptcy trustee did file a final report. And these show actual harm to the creditors, not just the one creditor about whom there was trial testimony, but all these exhibits that came in show by the defendant's own admission that she had dozens and dozens of creditors, most of whom went unpaid. For example, Government Exhibit 313 is the final report of the trustee from her first bankruptcy case filed in 2003. And in that case, it showed that five of her creditors were paid the most money for many of these cases, a total of over $17,000. On the other hand, there were 18 other creditors who had filed claims with the court who got nothing. They were paid nothing. Government Exhibit 412, which is the final report of the trustee from the 2004 case, shows that only two of her creditors were paid a grand total of $432, rounding up, while 21 creditors got nothing. But that's not unusual in bankruptcies, right? That's true. What's the counterfactual that we're comparing to? As I believe one or more of you have already observed, this isn't a typical garden variety bankruptcy case where a person simply goes into bankruptcy. This is a case in which a defendant has filed five consecutive bankruptcy Chapter 13 cases with the intent of not paying her creditors but basically hiding behind the protective automatic stay. So is the counterfactual a legitimate Chapter 7 filing at the outset? What are we comparing it to? She could have. In fact, she probably should have filed that. Your Honor asked about the amounts of assets versus liabilities. By the time she filed her third bankruptcy case, her assets were well below the amount of her liabilities, I think by close to $100,000 at that point. She certainly should not have been filing these Chapter 13 cases in which she's portraying herself as a debtor who's in a bit of a financial pinch at the moment but who has a means of repaying her creditors and landing on her feet. In fact, that's another part of the fraud in this case is when she filed her later petitions for bankruptcy under Chapter 13, she made false statements in a number of the different filings, the pleadings, the schedules that were submitted to the bankruptcy court in order to simply get the Chapter 13 plan approved. For example, in the third bankruptcy case, she falsely claimed that this other man, Eckhart Wilkie, was a co-debtor with respect to a mortgage and that he was contributing over $1,300 per month towards the mortgage. That made it feasible and possible for her to even get a Chapter 13 plan accepted. Similarly, in the fourth bankruptcy case, she falsely claimed that Wilkie was a co-debtor with respect to both a mortgage and a car loan and that he was contributing over $1,300 per month towards the mortgage as well as making monthly payments on the car loan. And again, that made it possible for her to even get a Chapter 13 plan accepted in the first place. She did the same thing in her fifth bankruptcy case, which was filed in October of 2009, and that was dismissed within a couple of months. At that time, she claimed that Mr. Wilkie was a co-debtor with respect to a car loan and that he was making payments on that as well as that he was a co-obligor with her on both mortgages on her condo and that he was contributing a total of over $1,800 per month towards that. If she hadn't included those false statements about all the other money that she had coming in, she would not have had a plan that would have been accepted by the bankruptcy trustee or the bankruptcy court. She wouldn't have had sufficient income reported to cover all the debts that she had. And as at least one of your honors has also noted, Judge Sykes referred recently to her concealing the asset. I mean, the shenanigans that went on with respect to this condo in which she transferred title first in 2005 to Wilkie but then flip-flopped it right back to herself, not reporting the second half of that transaction, making it appear that Wilkie had title to the property. That allowed, at that time in 2005, that allowed Wilkie to get a mortgage or two mortgages combined for a total of $240,000, almost a 50% increase over what she had been able to get under her own name. That was just additional debt that she acquired in the course of this scheme that she never had any intention of repaying and, in fact, couldn't repay because, as John noted, the amount of liabilities increased more and more so that by the time of her filing the fifth bankruptcy case, she had a negative net worth of over $400,000. If I could, I guess I'm trying to generalize a little bit here. Sure. I was asking you for the counterfactual. I haven't really heard one, but that's not necessarily the lack of an answer. One approach in these sorts of situations is to say that, look, it's the defendant who has caused the great uncertainty here with this continuing pattern of fraudulent activity that makes it impossible to determine with any real precision what would have happened but for the crime, and doubts basically get resolved in favor of the government and we expect district judges to be reasonable and to do something sensible here in a difficult problem. Is that what you're arguing? Because I'm troubled by the notion that kind of automatically any increases in debt should be treated as criminal loss amounts under the sentencing guidelines. Well, no, I'm certainly not arguing that broad rule that counsel espoused in which she said that the government is saying that any increase is fraudulent. No, this is a case-specific, fact-specific situation in which we're saying in this case, given all the fraudulent steps that she took over time and how she repetitively sought the protection of the bankruptcy court to hide from her creditors and to amass more debt, that in fact, as Judge Sykes said, and this goes to the amount of loss in the case, the judge's acceptance of the increase in debt was actually a very reasonable and a very conservative way of viewing the harm that she actually did in fact cause. Mr. Heinze. Yes, sir. When did the fraud begin? I'd say it began with her filing the first bankruptcy case. Yes. Certainly, by the time of her second bankruptcy case, she was taking... Yeah, the reason I ask, you posit this case, and it may well be that it's a little unique. I hope it's very unique. I understand that, but I'm just trying to put it into perspective and in a way follow up on what Judge Hamilton was saying about where we are in a counterfactual situation. So you would say it starts with the very first, but the tipping point is the second or third bankruptcy. Is that your position? I think that's probably a fair way of characterizing it. I would say it starts with the very first one because in that very first one, she acknowledged that she had debts of hundreds of thousands of dollars, and she proposed a plan that was ultimately accepted and confirmed by the bankruptcy court, yet she failed to pay within a year or a little over a year. She had failed to make so many payments that the bankruptcy trustee went into court to seek to have the case dismissed because she was not complying with the plan that she herself had come up with and said, this is what I can do in order to deal with it. That's surely not that unusual in Chapter 13 bankruptcies, is it? No. You wouldn't have had a viable case probably with just the first filing, right? No, and you're right. We wouldn't be here today and we wouldn't have charged that case in the first instance. In fact, there was testimony at trial that the majority of cases do not end up with the completion of the payment plan. We're not disputing that. The problem in this case, and what makes this a criminal case, is that Ms. Williams went back a second, a third, a fourth, a fifth time, and after the judge in the fifth case dismissed it and said all these cases have been filed in bad faith, I'm barring you from filing anything else for 180 days. At that point when the Condo Association was free to go to state court and actually follow through on the eviction action that they tried to bring, she then brings Mr. Wilkie back into the picture, gives him a false title to the condominium, and makes it appear, and induces him to file another, a sixth false bankruptcy case, which ultimately failed, but at least for the time being, forstalled, her being brought to face the consequences of what she had done over all these years. I think I'm running out of time. If your honors have any more questions, I'd be glad to answer them. If not, then in conclusion, in light of all the arguments that we've set forth, both in our brief and today, we respectfully ask that the court affirm both the conviction of Charlize Williams as well as the reasonable sentence that was imposed in this case. Thank you. Thank you, Mr. Hanson. Ms. Zahmer. I think your honors' questioning raises a number of very serious issues with regard to how to apply a rule in these kinds of circumstances. First, as was testified at trial by Mr. Olividotti, as well as Ms. Gretchen Silver, who were, Ms. Silver was a bankruptcy expert at trial. Mr. Olividotti has extraordinary experience in Chapter 13 bankruptcies. Serial filings are not uncommon in the bankruptcy process. So to say from the very beginning that there is some sense of certainty about where her intent took a place from trying to discharge her debt to something more unlawful, and of course we contest that, I think would render all other serial filings potentially fraudulent. There are many reasons that were testified to a trial as to why someone might have serial filings. And we raise this in reply, and I think there's an issue with the fact that we don't really know what persuaded the jury here. This was an unusual case. We don't have a specific verdict. We don't know what they discerned to be fraudulent. And I will say that this is not an impossible task to calculate loss here. This is actually relatively common in fraud cases. You have bank records. You have expenditures. You have records that can easily discern what was going on with loss. To take this... That's for an actual loss measure. This was an intended loss measure? All parties here agree this was actually an actual loss measure, including the district court and the government. I thought the district court used the intended loss calculus. No. The district court used an actual, as the government proposed. Of course, our theory was, as you need the greater of either the intended or the actual, our position was there was no intended loss. Ms. Williams was trying to gain control of the property that meant so very much to her and was hoping, against all hopes, that this would work out. If we were going through an intended loss analysis, and I recognize that I'm over my time, if we were going through an intended loss analysis, then there would be a wholly different record where her intent here would have been put at issue, and the substantial record that all she was trying to do here was save her property, not ignore medical debt or not ignore parking tickets that she had gotten, but try and keep this property that meant so much to her. We would be in a very different posture. So with that, we would ask that you would vacate her conviction and remand for new trial based on the Sixth Amendment violations, and if not that, we certainly ask for remand for resentencing so we can have some clarity and specificity on which this loss amount and number of victims was based. Thank you, Ms. Armour. Thank you. Ms. McCartin, thank you also for accepting this appointment and kindly representing the appellant, and thanks to the government for their participation. The case is taken under advisement. Court will proceed to adjournment.